UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

№ 12-CV-5927 (JFB) (AKT)

PASTOR PERRY HUTCHINS, ET AL.,

Plaintiffs,

VERSUS

ANDRE MARC PALMER, ET AL.,

Defendants.

**MEMORANDUM AND ORDER**
May 26, 2016

JOSEPH F. BIANCO, District Judge:

Plaintiffs, Pastor Perry Hutchins and Marian Hutchins ("plaintiffs"), commenced this action on November 30, 2012, against multiple defendants, including Andre Marc Palmer and Opal Palmer ("the Palmers" or "defendants"), alleging that the defendants committed federal civil RICO violations, committed fraud, violated the Investment Advisors Act, and breached their fiduciary duty to plaintiffs.

The Palmers have moved for summary judgment. For the reasons set forth below, the motion is granted as to the RICO claims. In light of the dismissal of the federal claims, the Court declines to exercise jurisdiction over the state law claims.

I. BACKGROUND

A. Facts

The Court takes the following facts from the parties' declarations, exhibits, and Rule 56.1 Statements of Fact. The Court construes the facts in the light most favorable to plaintiffs, the nonmoving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005). Although the Rule 56.1 statements contain specific citations to the record, the Court cites to the statements rather than to the underlying citations. The Court recognizes that there are a number of disputed facts; however, even accepting plaintiffs' version of events as true, the Court finds that the RICO claims are barred by the statute of limitations for the reasons discussed *infra*. A summary of the plaintiffs' version of the facts is set forth below.

Plaintiffs invested in four real estate transactions with the assistance of Andre Palmer: (1) a brownstone in Brooklyn, New

York; (2) the Allendale Road property in Maryland; (3) the Park Heights property in Maryland; and (4) the Scott property in California. (Defs.' 56.1 ¶¶ 1-2.)

In 2006, Andre Palmer presented Pastor Hutchins with an opportunity to invest in the renovation of a Brooklyn brownstone, advised plaintiffs to borrow $100,000 from a home equity line of credit ("HELOC"), and told Hutchins that if he invested $100,000 in the property, he would be paid back and receive 18% interest within three months. (Pls.' 56.1 ¶ 25.) Around June 2006, Hutchins invested $100,000 in the Brooklyn brownstone, and three months later, he received his original investment and 18% interest. (*Id.* ¶ 26.) Between September and December 2006, Andre Palmer alerted Pastor Hutchins to the additional three investment opportunities. (*Id.* ¶ 28.)

In September 2006, Andre Palmer spoke with Pastor Hutchins about an opportunity to invest in the Allendale Road property with PASCO, a corporation managed by Roscoe Johnson. (*Id.* ¶ 31.) On September 22, 2006, Hutchins wrote a $25,000 check to PASCO in exchange for an indenture purporting to hold the deed to the Allendale property in escrow until the $25,000 was repaid. (*Id.* ¶ 33.) By December 22, 2006, Johnson had not paid back the principal, nor had he made any interest payments to plaintiffs. (*Id.* ¶ 34.) In a May 17, 2007 letter, Johnson informed Hutchins that he would make interest payments of $3,750 every three months until the loan was repaid; however, only two $3,750 payments were made. (*Id.* ¶ 35.) Johnson claimed that he used the interest payments to pay for labor and renovations on the Park Heights property. (*Id.* ¶ 36.) In January 2008, Johnson told Pastor Hutchins that he had to come up with $4,200 to pay for back taxes and penalties on the Allendale property in order to prevent the loss of his investment. (*Id.* ¶ 37.) Plaintiffs eventually learned that, on or about October 1, 2008, PASCO obtained a home equity loan for $297,000, which was secured by the Allendale Road property. (*Id.* ¶ 38.)

In October 2006, Andre Palmer and Pastor Hutchins went to Maryland to inspect the Allendale Road property. (*Id.* ¶ 39.) During this trip, Palmer, Hutchins, and Johnson discussed the Park Heights property. (*Id.*) According to plaintiffs, Palmer presented a deal where Palmer and Hutchins would pay $23,500 to purchase a run-down house, which Johnson and PASCO would renovate and sell at a public raffle, and then, Palmer and Hutchins would split the proceeds. (*Id.* ¶¶ 40-41.) On December 7, 2006, Hutchins gave Wesley Pittman $22,500 for the Park Heights property; however, Pittman did not own the property until December 12, 2006, when he purchased it for $14,500. (*Id.* ¶ 43.) On December 19, 2006, Pittman conveyed the property to Hutchins and Palmer. (*Id.*) Plaintiffs claim that Johnson coerced them into paying for at least $30,000 for renovations, but would not give plaintiffs receipts to show how the payments were used, until he produced an inaccurate accounting in June 2009. (*Id.* ¶¶ 48-50, 53.) Plaintiffs also claim that Johnson became "hostile" and "belligerent" towards them, and that Palmer failed to intervene on their behalf, other than to explain that $3,750 of interest payments due to them on the Allendale Road property were "sweat money." (*Id.* ¶¶ 55-57.) In a letter dated January 27, 2009, Palmer relinquished ownership rights to the Allendale Road property and indicated that any profits from the property would go to plaintiffs. (*Id.* ¶ 58.) Plaintiffs allege that on three different occasions (in February 2008, February 2009, and October 2009) Johnson demanded that they transfer the property to PASCO for the raffle and required plaintiffs to pay a $500 appraisal fee each time, but that the raffle never took place. (*Id.* ¶¶ 60-63, 65.) In

2

August 2011, the Securities Commissioner of Maryland determined that Johnson violated Sections 11-301 and 11-501 of the Maryland Securities Act in connection with the Allendale and Park Heights properties. (*Id.* ¶ 66; Ex. Y to Pls.' Decl.)

In November 2006, Palmer told Hutchins of an investment opportunity in California, which would require Hutchins to provide $60,000 to a couple in California – Bernie Scott, Jr. and Zena Scott – in exchange for his money back in three months, plus 17% interest per annum, all to be paid on or before March 30, 2007. (*Id.* ¶ 67.) Palmer introduced Curtis Peterson to plaintiff as the "California broker" for the transaction. (*Id.* ¶ 68.) According to plaintiffs, they were assured that the investment was "safe," and on November 30, 2006, they invested $60,000, which was secured by the Scott property and of which $48,000 went to the Scotts and $12,000 went to Palmer for his services. (*Id.* ¶¶ 68-69.) According to plaintiffs, they were never put on the deed for the Scott property, and when Palmer was asked why plaintiffs were not on the deed, he gave conflicting information; on March 17, 2009, he said that Hutchins was not put on the deed, and on March 23, 2009, he said that Hutchins was added to the deed, but that no lien was placed on the property. (*Id.* ¶ 70.)

Plaintiffs further allege that, on or about January 4, 2007, Palmer signed a promissory note to repay a loan to Hutchins of $1,850 plus 12% interest, and on or about February 2, 2007, Palmer wrote a check to PASCO for $1,850. (*Id.* ¶ 72.) Plaintiffs allege that, when Hutchins asked Palmer to repay the loan in June 18, 2009, he said that he had no memory of a personal loan, and never repaid it. (*Id.*)

Plaintiffs allege that Opal Palmer was involved in these transactions because of the following: (1) she was present at meetings between Pastor Hutchins and her husband; (2) she took notes at board meetings for Rhema (a corporation managed by the Palmers) and PASCO; (3) she wrote checks from her personal account to Rhema's account; (4) she worked at Rhema in 2006 when her husband introduced Hutchins to the investments; and (5) she was the last user to save the "Private Club Member Statements" that Rhema sent to its OLINT[1] investors in September 2007. (*Id.* ¶ 73.)

B. Procedural History

On November 30, 2012, plaintiffs filed the instant action. Although plaintiffs sued twelve different defendants, only defendants Andre Marc and Opal Palmer, and Pittman have responded. A stipulation dismissing Pittman from the case was filed and so ordered on November 14, 2013. (ECF No. 33.)

On October 7, 2015, defendants Andre Marc and Opal Palmer filed a motion for summary judgment. Plaintiffs filed their response on November 10, 2015, and defendants filed their reply on November 23, 2015. Oral argument was held on January 5, 2016. The Court has fully considered the parties submissions.

II. STANDARD OF REVIEW

The standard for summary judgment is well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may grant a motion for summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[1] OLINT was a company in which Andre Palmer invested funds, which was subsequently closed down by the Attorney General of Florida. (Defs.' 56.1 ¶ 11; Pls.' 56.1 ¶ 11.)

56(a); *see also Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013). The moving party bears the burden of showing that he is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "'is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.'" *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (alteration in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249-50 (internal citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties alone will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

III. DISCUSSION

Defendants move for summary judgment, arguing that plaintiffs' RICO claims are time-barred by the statute of limitations and, in any event, that plaintiffs do not plausibly allege a RICO violation. Defendants also argue that plaintiffs fail to state a claim for fraud or a violation of the Investment Advisors Act.[2] For the reasons set forth below, the Court concludes that plaintiff's RICO claims are time-barred and must be dismissed.[3] Given the dismissal of plaintiff's federal claims, the

---

[2] At oral argument, counsel for defendants agreed to voluntarily withdraw the Investment Advisors Act claim.

[3] Defendants also argue that plaintiffs do not allege a plausible RICO violation. However, given that the RICO claims are barred by the statute of limitations, the Court need not address this issue.

Court declines to exercise jurisdiction over the state claims.

## A. RICO

### 1. Legal Standard

Under RICO, it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). "When § 1962 is violated, in addition to criminal penalties, the RICO statutes also authorize civil lawsuits, which, if successful, can entitle a plaintiff to treble damages, costs, and attorney's fees." *DLJ Mortg. Capital, Inc. v. Kontogiannis*, 726 F. Supp. 2d 225, 236 (E.D.N.Y. 2010) (citing 18 U.S.C. § 1964(c)). Specifically, RICO provides a private cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c).

"To establish a civil RICO claim [under 18 U.S.C. § 1964(c)], a plaintiff must allege '(1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity,' as well as 'injury to business or property as a result of the RICO violation.'" *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013) (quoting *Anatian v. Coutts Bank Ltd.*, 193 F.3d 85, 88 (2d Cir. 1999)). "The pattern of racketeering activity must consist of two or more predicate acts of racketeering." *Id.* (citing 18 U.S.C. § 1961(5)). Racketeering activity is defined as "any act which is indictable" under specified provisions of Title 18, including mail fraud, wire fraud, extortion, and bank fraud. 18 U.S.C. § 1961(1)(B).

"RICO claims are subject to a four-year statute of limitations." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 148 (2d Cir. 2012); *see also Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156-57 (1987). In *Bankers Trust Co. v. Rhoades*, the Second Circuit held that "each time a plaintiff suffers an injury caused by a violation of 18 U.S.C. § 1962, a cause of action to recover damages based on that injury accrues to plaintiff at the time he discovered or should have discovered the injury." 859 F.2d 1096, 1102 (2d Cir. 1988). This is known as the "separate accrual" rule, "under which a new claim accrues, triggering a new four-year limitations period, each time plaintiff discovers, or should have discovered, a new injury caused by the predicate RICO violations." *Bingham v. Zolt*, 66 F.3d 553, 559 (2d Cir. 1995). In *Bingham*, the Second Circuit recognized the following, "necessary corollary of the separate accrual rule":

> plaintiff may only recover for injuries discovered or discoverable within four years of the time suit is brought. As long as separate and independent injuries continue to flow from the underlying RICO violations—regardless of when those violations occurred—plaintiff may wait indefinitely to sue, but may then win compensation only for injuries discovered or discoverable within the four-year "window" before suit was filed, together, of course, with any provable future damages.

*Id.* at 560 (internal citations omitted); *see also Elsevier, Inc. v. Grossman*, No. 12-CV-5121 (KPF), 2013 WL 6331839, at *8 (S.D.N.Y. Dec. 5, 2013) ("Regardless of when Plaintiff discovered its claims, Plaintiff

5

may only be *compensated* for injuries discovered or discoverable within the four-year 'window' before suit was filed . . . .").

The four year statute of limitations "runs even where the full extent of the RICO scheme is not discovered until a later date, so long as there were 'storm warnings' that should have prompted an inquiry." *World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 328 F. App'x 695, 697 (2d Cir. 2009) (citing *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 427 (2d Cir. 2008) (describing the "storm warnings" rule as "well-settled law in this Circuit")); *see also Koch*, 699 F.3d at 153 ("[T]he Court must determine when a reasonably diligent investigation would have revealed the injury to a person of reasonable intelligence, and the statute of limitations begins to run on that date. . . . The existence of 'storm warnings' sufficient to trigger inquiry notice does not begin the clock when the plaintiff actually pursues an investigation." (internal citation omitted)). "[O]nce there are sufficient 'storm warnings' to trigger the duty to inquire, and the duty arises, if a plaintiff does not inquire within the limitations period, the claim will be time-barred. In such a case, knowledge of facts that would suggest to a reasonably intelligent person the probability that the person has been injured is dispositive." *Koch*, 699 F.3d at 153.

2. Application

Here, defendants argue that plaintiffs' RICO claims should be dismissed as time-barred. In response, plaintiffs contend that "[t]he first possible 'storm warnings' occurred no earlier than March 2009." (Pls.' Opp. at 9.) The Court concludes that plaintiffs were on notice of "storm warnings," which should have prompted an inquiry, more than four years before they commenced their suit in November 30, 2012, and thus, that plaintiff's RICO claims are time-barred.

Specifically, as to the Allendale Road Property, all payments plus interest were to be completely paid by December 22, 2006. (Ex. K to Defs.' Mot.) Further, according to plaintiffs, beginning in 2008, they made demands for repayment of their investment. (Am. Compl. ¶ 43.) As an initial matter, the fact that plaintiffs were not paid back in December 2006, as the mortgage note promised, should have alerted the plaintiffs to a potential problem. Further, if for some reason plaintiffs thought they would still be repaid sometime after December 2006, the fact that they demanded repayment in 2008, indicates their awareness of an injury at that time.

As to the Park Heights property, plaintiffs allege that they jointly held title to the property in December 2006 with defendants, and that the property was intended to be renovated and auctioned off through raffle tickets. However, it is undisputed that the raffle never occurred. When the raffle did not occur as promised, a reasonable person would have been on notice to investigate why the raffle never occurred. Further, plaintiffs hired an attorney in 2008 who sent Andre Palmer and Johnson a letter on August 11, 2008, requesting an update of the status of the repayment of the loans and settling of the real estate investments for both the Allendale and Park Heights properties. (Ex. A to Defs.' Reply.) Such action strongly indicates that plaintiffs were on notice of wrongdoing as to each of these properties by August 2008. *See, e.g.*, *Takeuchi v. Sakhai*, No. 05-CV-6925 (JSR), 2006 WL 119749, at *3 (S.D.N.Y. Jan. 17, 2006) (finding plaintiff was "well aware of his potential injury" when he sent letters accusing defendant of tricking him and suggesting that he would sue), *aff'd*, 227 F. App'x 106 (2d Cir. 2007).

As to the California property, plaintiffs entered into an agreement with defendants Bonnie and Zena Scott to lend them funding. In exchange for the funding, the Scotts signed a mortgage note, placing their home as collateral for the loan, on November 30, 2006. (Ex. D to Defs.' Mot.) The Scotts also executed a deed, which gave Perry Hutchins full interest in the property. (Ex. E to Defs.' Mot.) According to Hutchins, they were to receive money back in three months, plus 17% interest per annum, to be paid back in full by March 30, 2007. (Pls.' Decl. at ¶ 55.) Yet, it is undisputed that plaintiffs were not paid back by March 30, 2007. Once payment was not made in March 2007, plaintiffs' injury was discoverable, particularly considering that plaintiffs were previously not paid in December 2006, as promised for the Allendale Road Property.

Notwithstanding the multiple "storm warnings," beginning in December 2006 and continuing through August 2008, plaintiffs waited to commence their lawsuit until November 30, 2012, well beyond the time that plaintiffs either knew or should have known that they would not be paid back. Plaintiffs argue that there were no "storm warnings until March 2009" because (1) they did not learn that their name was not on the Scott property deed and that there was no lien on the Scott property until March 2009; (2) they had discussions seeking repayment of the loan for the Allendale Road property in July and August 2009; and (3) they continued to transfer ownership in the Park Heights property for a raffle through November 2009. (Pls.' Opp. at 9.) However, such assertions are not persuasive. First, the question is not when plaintiffs actually determined there was fraud, but when a reasonable person would have been on inquiry notice. *See, e.g.*, *Koch*, 699 F.3d at 153 ("The existence of 'storm warnings' sufficient to trigger inquiry notice does not begin the clock when the plaintiff actually pursues an investigation. . . . knowledge of facts that would suggest to a reasonably intelligent person the probability that the person has been injured is dispositive."); *Rio Tinto PLC v. Vale*, No. 14-CV-3042 (RMB)(AJP), 2015 WL 7769534, at *3 (S.D.N.Y. Nov. 20, 2015) ("The key inquiry is not whether the plaintiff had all the information available to him, but whether plaintiff knew enough to sue." (internal quotation marks and citation omitted)). Second, plaintiff's assertions that they were not on notice of the potential fraud before March 2009 is belied by the evidence previously discussed – in particular, that by August 2008, plaintiffs had hired a lawyer to determine what happened to their Maryland real estate investments. Thus, based on the "considerable evidence that [plaintiffs were] well aware of [their] potential injury" by at the latest August 2008, the Court finds that plaintiffs' claims are time-barred. *Takeuchi*, 2006 WL 119749, at *3; *see also Koch*, 699 F.3d at 153 (affirming district court's determination that RICO claims were time-barred where plaintiff was aware of multiple sources suggesting defendant's product was not authentic five years before he began to investigate); *World Wrestling Entm't, Inc.*, 328 F. App'x at 697 (affirming dismissal of RICO claims where there were "at least four 'storm warnings' that put plaintiff on inquiry notice of a possible RICO claim" six years before complaint was filed).

IV. STATE LAW CLAIMS

Having determined that plaintiffs' RICO claims against defendants do not survive summary judgment, the Court concludes that retaining jurisdiction over any state law claims is unwarranted. *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *see also Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 137 (2d Cir. 2003) (after holding that RICO claims should have been dismissed for lack of standing, remanding the case to the

district court to decide whether to retain supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(c)). "In the interest of comity, the Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.'" *Birch v. Pioneer Credit Recovery, Inc.*, No. 06-CV-6497T, 2007 WL 1703914, at *5 (W.D.N.Y. June 8, 2007) (quoting *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986)).

Therefore, in the instant case, the Court, in its discretion, declines to exercise supplemental jurisdiction over any remaining state law claims because "it 'has dismissed all claims over which it has original jurisdiction.'" *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3)); *see also Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 250 (2d Cir. 2008) ("We have already found that the district court lacks subject matter jurisdiction over appellants' federal claims. It would thus be clearly inappropriate for the district court to retain jurisdiction over the state law claims when there is no basis for supplemental jurisdiction."); *Karmel v. Claiborne, Inc.*, No. 99-CV-3608 (WK), 2002 WL 1561126, at *4 (S.D.N.Y. July 15, 2002) ("Where a court is reluctant to exercise supplemental jurisdiction because of one of the reasons put forth by § 1367(c), or when the interests of judicial economy, convenience, comity and fairness to litigants are not violated by refusing to entertain matters of state law, it should decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue the matter in state court.").

Accordingly, pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to retain jurisdiction over plaintiff's remaining state law claims, and dismisses such claims without prejudice.

V. CONCLUSION

For the reasons set forth herein, the Investment Advisers Act claim is voluntarily dismissed, and the Court grants defendants' motion for summary judgment as to plaintiffs' remaining federal claims under RICO. The Court declines to exercise supplemental jurisdiction over the state law claims, and thus, dismisses such claims without prejudice.

SO ORDERED.

———————————
JOSEPH F. BIANCO
United States District Judge

Dated: May 26, 2016
   Central Islip, NY

\*  \*  \*

Plaintiffs are represented by Mitchell J. Robert and Uri Nazryan, Rotbert Business Law P.C., 1050 Connecticut Avenue, N.W., 5th Floor, Washington, D.C. 20036. Defendants are represented by Vernita Charles, Law Office of Vernita Charles, 44 Court Street, Suite 1210, Brooklyn, NY 11201.